IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

AUG 0 8 2012

David J. Bradley, Clerk of Court

IN RE:

| | | |
|---|---|---|
| ASARCO LLC, | § | |
| Debtor. | § | CASE NO.: 2:11-CV-290 |
| | § | |
| | § | Bankruptcy Case No. 05-21207 |
| ASARCO LLC, | § | |
| Appellant, | § | |
| | § | |
| VS. | § | |
| | § | |
| BAKER BOTTS, L.L.P. and JORDAN, | § | |
| HYDEN, WOMBLE, CULBRETH & | § | |
| HOLZER, P.C., | § | |
| Appellees. | § | |

## MEMORANDUM OPINION AND ORDER
## ON THE FEE APPLICATION OF BAKER BOTTS, L.L.P

The primary issue in this case presents the Court with a somewhat unusual, but, in substance, a very simple question. Its answer is not nearly so simple. The answer is complex in legal terms and has competing equitable arguments that make this Court's ruling somewhat harsh or conversely somewhat generous depending on one's point-of-view. The primary question before the Court is:

> Should a well-compensated law firm that performed superbly in a hotly contested adversary proceeding, and whose client, the debtor, received an extremely favorable result, receive compensation in addition to its agreed upon and approved professional rates, due to the benefit the result conferred upon the estate?

ASARCO, the debtor in the bankruptcy and the plaintiff in the adversary case, was represented by Baker Botts, L.L.P. (hereinafter "Baker Botts") and Jordan, Hyden, Womble, Culbreth & Holzer, P.C., its local/co-counsel (hereinafter "Jordan Hyden") in Corpus Christi and

Brownsville.[1]  This Court has on more than one occasion described this case as perhaps the most successful outcome in bankruptcy history.  The Bankruptcy Court has also used glowing terms to describe the overall results achieved, including the fact that ASARCO exited bankruptcy with approximately $1.4 billion in cash and with comparatively little outstanding debt.  This result includes the resolution of very serious environmental, asbestos, and toxic tort issues.

All parties have conceded in one forum or another and the Bankruptcy Court found that an integral, if not the critical factor of the overall success was the judgment entered by this Court in Civil Action No. B-07-018; ASARCO LLC; Southern Peru Holdings, LLC vs. Americas Mining Corporation (hereinafter the "SCC" case).  This adversary trial resulted in a verdict returning all of the transferred stock in Southern Peru Copper Company to ASARCO along with over a billion dollars in cash.  The value of this stock was estimated by the parties to be in excess of $6 billion with some estimates going as high as $9 billion.  This judgment directly led to the overall resolution of the bankruptcy on terms favorable to the debtor and resulted in a 100% payment (including interest and attorneys' fees) to all creditors.  This verdict was the result of a hard fought case that was tried to the Bench over a period of four (4) weeks.  Both sides were represented by competent counsel and the performance of all counsel involved would rank them in the highest echelon of the nation's legal community.  The lawyers for both sides, while adversaries, worked together in a manner which represented the best traditions of the legal profession.  In fact, it is a tribute to the professionalism of both sides that the attorneys were able to compact their presentations of quite complicated issues

---

[1]ASARCO will be referred to merely as "ASARCO" if the reference pertains to ASARCO prior to plan confirmation, but it will be referred to as "Reorganized ASARCO" if the reference is to the post-confirmation entity.  Additionally, the Court will refer to the parties in bankruptcy ASARCO and its various subsidiaries in the singular either as "ASARCO" or "Debtor."

into the four (4) week trial period allotted by this Court.

Not only was the trial complicated, but the pre-trial and post-trial issues were also quite complex. There were five (5) causes of action involving multiple states with various conflict of laws and choice of law issues. The discovery in this case was intense and the Court, given the ongoing bankruptcy, instituted a somewhat shortened time schedule in order to accommodate a quicker resolution. The lawyers had to work diligently to accomplish the needed discovery and timely prepare the case for trial. After the trial, there were multiple post-trial issues, including the issue of how to structure the judgment and the posting of an appellate bond in preparation for the appeal.[2] In all, this Court wrote opinions on various issues totaling hundreds of pages. A review of the preparation and actual trial of this matter would lead any reasonable person to conclude that the lawyers involved in the case performed superbly, professionally, and that they diligently prosecuted and/or defended the case. These conclusions are unavoidable and, quite frankly, are not seriously contested in this appeal.

The primary contested issue in this matter is whether the lawyers representing ASARCO are entitled to an enhancement of their fees based upon the result they achieved for the Debtor's estate. The Court notes that while the Bankruptcy Court's opinion goes to great lengths to praise Baker Botts's overall representation of the Debtor, the fee enhancement in this appeal is based solely on its handling of the SCC case in this Court. The Bankruptcy Court did not award any enhancement based upon the overall handling of the protracted bankruptcy proceedings, holding, in effect, that Baker Botts's performance was superb, but was the quality to be expected from well-trained, hard-

---

[2]A bond was posted and an appeal was initiated. The appeal was ultimately dismissed after the Parent's Plan was confirmed by this Court.

working, and well-compensated professionals. Thus, this Court has not only the record before it from the Bankruptcy Court below, but also has intimate knowledge of the case that is the basis of the enhancement. While it has such knowledge and may, in the following pages below, reference that knowledge for the purpose of context (or to set the scene of certain issues), it will limit its consideration of this appeal to that of any district court sitting as an appellate court in a bankruptcy proceeding. In other words, it will not substitute its own factual knowledge or beliefs for the findings of the court below. The Court therefore will:

> . . . review the bankruptcy court's award of attorneys' fees for abuse of discretion. In re Coho Energy, Inc., 395 F.3d 198, 204 (5th Cir. 2004); In re Barron, 325 F.3d 690, 692 (5th Cir. 2003). An abuse of discretion occurs where the bankruptcy court (1) applies an improper legal standard or follows improper procedures in calculating the fee award, or (2) rests its decision on findings of fact that are clearly erroneous. In re Evangeline Refining Co., 890 F.2d 1312, 1325 (5th Cir. 1989). Accordingly, we review the bankruptcy court's legal conclusions de novo and its findings of fact for clear error. Coho Energy, 395 F.3d at 204; Barron, 325 F.3d at 692.

In re Cahill, 428 F.3d 536, 539 (5th Cir. 2005).

## I.   **Background and Issues Presented**

As stated earlier, the issues presented on this appeal are fairly straightforward: (1) did the Bankruptcy Court err in awarding the fee enhancement; (2) did the Bankruptcy Court err in awarding attorneys' fees and expenses for the preparation and defense of the fee application (which included the prosecution of the request for the fee enhancement); and (3) was the Bankruptcy Court's award of post-judgment interest on these amounts in error?

The pertinent background in this matter is also straightforward, especially when one considers how complicated and protracted some of the bankruptcy issues in the underlying case actually were. The Debtor hired Baker Botts as Debtor's counsel initially for some of its subsidiaries and then later for itself. Baker Botts was initially engaged in 2005. Jordan Hyden served as counsel

for ASARCO's subsidiaries which preceded ASARCO into bankruptcy, as local counsel in Corpus

Christi where the ASARCO bankruptcy was actually filed, and also as local counsel in the SCC

litigation in Brownsville. The bankruptcy continued for a number of years and included a variety

of legal, factual, and economic hurdles until finally a plan of reorganization was confirmed by this

Court in November of 2009. The bankruptcy result was a resounding success regardless of the

measurement used. The debtor emerged as a financially sound, functioning entity. All of the

creditors were completely paid (including interest and attorneys' fees). Potential creditors such as

possible asbestos or environmental claimants were protected by well-funded trusts. The ultimate

success of this bankruptcy process can be attributed to a number of factors, but regardless as to how

one analyzes these, one cannot escape the conclusion that the SCC judgment was the single biggest

factor that led to this success.

In its final fee application to the Bankruptcy Court, Baker Botts asked the Court to approve

$135,870,714.58 in fees and $6,046,135.06 in expenses of which $113,074,527.74 had already been

approved on an interim basis under § 331. The unapproved amounts were categorized by the

Bankruptcy Court as follows:

1.  $263,994.74 - additional unpaid fees (between November 1, 2009 and December 8, 2009).

2.  $22,645,119.10 - fee enhancement to fees already charged based upon a § 330 and lodestar analysis.

3.  Minus $112,927.00 as a voluntary credit.

4.  $8,004,920.50 in fees and $457,443.83 in expenses incurred by the firm in preparing and defending the fee application through July 13, 2010 (comprised of $5,042,001.50 in fees and $199,900.60 in expenses defending the fees that had been approved on an interim basis and those sought through December 8, 2009; $2,684,243.50 in fees and $252,883.23 in expenses for pursuing its 20% enhancement request; $42,845.50 in fees incurred for non-working

travel time through July 6; and $235,830.00 in fees and $4,660.00 in expenses estimated to carry it through the fee application process).

The Bankruptcy Court held multiple hearings, heard testimony and argument, and ultimately in a thorough opinion, ruled that Baker Botts should recover:

1.  $117,387,304.44 in fees and $6,046,135.06 in expenses (comprised of $113,074,527.74 in fees already approved on an interim basis); (2) $263,994.74 unpaid fees incurred between November 1, 2009 and December 8, 2009 plus a $4,161,708.96 enhancement based upon its services in a rare and extraordinary circumstance; minus the $112,927.00 voluntary credit. The $6,046,135.06 figure was comprised of: (1) 6,065,598.58 of expenses already approved minus $19,463.52 voluntary credit.

2.  $5,000,000.00 in fees and $457,443.83 in expenses for preparing and defending its fee application.

3.  Post-judgment interest on all accrued amounts.

As stated above, Reorganized ASARCO, the United States Trustee, and the Plan Administrator complain in varying degrees that the Bankruptcy Court erred in including in the above awards the following items:

1.  A $4,161,708.96 enhancement for the SCC litigation.

2.  The $5,457,443.83 in fees and expenses for the preparation and defense of its fee application.

3.  The award of post-judgment interest.

Finally, both the office of the United States Trustee and Reorganized ASARCO joined in an additional argument. They argue that the Court should apply the same test for approving a fee enhancement that the Supreme Court set forth in Perdue v. Kinney, ___ U.S. ___, 130 S.Ct. 1662, 176 L.Ed. 2d 494 (2010). They assert that if this Court does that, it will be forced to conclude that the award of the enhancement made by the Bankruptcy Court was in error.

The response by Baker Botts is likewise simple. Initially, by national standards, it claims it

was undercompensated by up to 20%. The Bankruptcy Court made a finding of under-payment and there is evidence to support it. Secondly, it argues that it successfully prosecuted the largest fraudulent transfer case in United States history. That judgment proved to be the decisive factor in having two 100% payment reorganization plans. The Bankruptcy Court found that the Parent effectively paid $1 billion for the judgment by virtue of its reorganization plan. Consequently, if there was ever a case where a fee enhancement is appropriate, this is it.

Baker Botts also argues that Perdue v. Kinney was a fee-shifting case and that the entire rationale underlying the majority opinion is the concept of shifting fees. Consequently, Baker Botts concludes it has no application in a bankruptcy context. Lastly, it argues that even if one applies the guidelines set out in Perdue v. Kinney, the record before the Bankruptcy Court supports the enhancement.

## II.      The Application of Perdue v. Kinney to this Case

The Trustee and the Reorganized Debtor argue that the dictates of the Supreme Court in Perdue v. Kinney control the outcome of this fee application. Perdue was a case involving the award of a fee enhancement in a federal fee-shifting context. Appellant argues here that had the Bankruptcy Court followed the rules set out in Perdue, it would have been forced to deny the fee enhancement. This Court has delayed its ruling in hopes that the Fifth Circuit would resolve the issue of the application of Perdue to bankruptcy cases. The Circuit has heard oral argument, but not issued a ruling, in CRG Porters L.L.C. v. United States Trustee, 445 B.R. 667 (N.D. Tex. 2011), in which the District Court held that Perdue did not apply to bankruptcy cases. The resolution of that case will in all likelihood resolve this legal issue.

Baker Botts claims that it is entitled to the fee enhancement regardless of the application of

<u>Perdue</u>. It claims that the evidence adduced by the Bankruptcy Court satisfies the stricter standards for fee enhancements set out in <u>Perdue</u>.

The majority opinion in <u>Perdue</u> severely restricts the award of fee enhancements. The guidelines it sets out are as follows:

1.      A reasonable fee is that sufficient to induce a capable attorney to undertake the case.

2.      The lodestar method yields a fee that is presumptively sufficient to reach this objective

3.      Enhancements may be awarded in "rare" and "exceptional" circumstances.[3]

4.      A "lodestar" calculation includes most, if not all, of the relevant factors constituting reasonable attorney fees <u>and</u> an enhancement may not be based upon a factor already subsumed in the lodestar calculation.

5.      The burden of proof is always on the proponent of the enhancement.

6.      One seeking an enhancement must produce specific evidence to support the award.

It is certainly important to note that the Court introduced these guidelines by describing them as being gleaned from their prior <u>fee-shifting</u> cases. <u>Perdue v. Kinney</u>, 130 S.Ct. at 1672–73.

Having delineated these instructive principles, the Court then described a few factual scenarios which would support a fee enhancement in excess of the lodestar calculation, only the first of which arguably applies. They include cases:

1.      Where the method used to calculate the hourly rate in the lodestar calculation does not adequately measure the attorney's true market value (as demonstrated during the litigation);[4]

---

[3]Interestingly, this guideline was preceded by the Court's aside that it had never yet affirmed an enhancement.

[4]Baker Botts argues, based upon the results, that it fits under this exception. In doing so, however, it ignores crucial passages in the majority opinion. The first was the discussion immediately following the Court's announcement of this exception. The Supreme Court included the caveat that skill and experience are factors considered in the hourly rate. It hypothesized that an enhancement situation might occur when the hourly rate was based solely

8

2.      Where an attorney's performance includes an extraordinary outlay of expenses and the litigation is protracted;[5]

3.      Where extraordinary circumstances delay payment.[6]

The Court, more importantly for this case, engaged in two specific discussions. First, it specifically rejected the concept that an enhancement is appropriate merely because departures from hourly fees are becoming more frequent. The second discussion, and more importantly one that Baker Botts seems to gloss over, centered on whether the quality of an attorney's performance and/or the results obtained may provide a basis for an enhancement. The Court first decided to treat these two factors as one since superior results are only relevant to fee enhancements to the extent that they are the result of outstanding attorney performance (as opposed to luck, inferior performance by defense counsel, unexpectedly favorable court rulings, etc.). The Court then held:

> We conclude that there are few such circumstances, but these circumstances are "rare" and "exceptional" and require specific evidence that the lodestar fee would not have been "adequate to attract competent counsel" [citing Blum v. Stenson, 465 U.S. 886, 897 (1984)].

---

upon a single factor—such as years in practice, but it mandated that a court must make specific findings concerning that lawyer and the prevailing market rate. Baker Botts contends that this case is an example of what the Supreme Court was anticipating. There was testimony that Baker Botts's rates were 20% below competitive national firms, and arguably this evidence could have been used, under non-Perdue case law, to adjust the lodestar calculation. Nevertheless, no findings, such as those contemplated by the Supreme Court's opinion in Perdue, exist here. Baker Botts used its regular rates. It did not bill ASARCO, as it has to other clients, a premium or discount rate. Further, the uncontroverted testimony indicates that multiple factors went into the establishment of Baker Botts's standard rates in this case such as the skill of the lawyer; the ability of the lawyer to handle novel and complex issues; the location of the lawyer; the creativity, skill, and experience of the lawyer; the ability to make critical legal maneuvers and deliver whatever brilliance the individual has to offer. (See testimony of Jack Kinzie).

[5]The enhancement must be reasonable and objective, and limited to compensation for the delay in reimbursement.

[6]Again, the Court suggested that the delay in certain fee-shifting cases is usually taken into consideration by a rate adjustment.

9

Id. at 1674 [emphasis added].

This Court finds that if Perdue applies to this case, the enhancement of the SCC fees cannot stand. There is no proof in the record that would support a finding that the approximately $20 million ($354 per hour blended rate) paid to Baker Botts, pursuant to the lodestar calculation for the SCC case, would not have attracted other competent counsel.[7] Clearly, for a blended rate (which included non-lawyers) of $354 competent lawyers could have been found to try the SCC case. The result may not have been the same, but that does not change a Perdue analysis.

Having found that Perdue would require a reversal of the enhancement award if applied, this Court hereby declines to apply Perdue in this case. There are any number of reasons, both factual and legal, why the rules espoused in the Perdue case should not apply to bankruptcy cases—not the least of which is the very limiting language used by the Supreme Court itself. This language (and many other reasons) have been articulated by the Bankruptcy Court, and other courts cited in that opinion, and need not be reiterated here. This Court agrees with the general reasoning outlined in those decisions.

There is an additional reason that this Court will not apply Perdue to this case. This Court would not hesitate to apply Supreme Court precedent—even if it effectively overruled Fifth Circuit precedent—where it clearly applies. Here, however, it does not clearly apply and any expansion of the Perdue rulings should be left to the Circuit. The new application of law to a different category of cases—especially when it would contravene the spirit, if not the exact holding, of a multitude of Fifth Circuit cases resides solely within the province of the Circuit itself.

---

[7]Not surprisingly, given the lack of evidence on this topic, there is no finding by the Bankruptcy Court that adequate counsel could not have been hired for this amount.

The Fifth Circuit has written on multiple occasions on the topic of fee awards in bankruptcy

cases.

> The Fifth Circuit has traditionally used the lodestar method to calculate "reasonable"
> attorneys' fees under § 330.  In re Fender, 12 F.3d 480, 487 (5th Cir. 1994).  A court
> computes the lodestar by  multiplying the number of hours an attorney would reasonably
> spend for the same type of work by the prevailing hourly rate in the community.  Shipes v.
> Trinity Indus., 987 F.2d 311, 319 (5th Cir. 1993).  A court then may adjust the lodestar up
> or down based on the factors contained in § 330 and its consideration of the twelve factors
> listed in Johnson, 488 F.2d at 717–19.  See Fender, 12 F.3d at 487.  While the bankruptcy
> court has considerable discretion in applying these factors, In re First Colonial Corp. of
> America, 544 F.2d 1291, 1298 (5th Cir. 1977), it must explain the weight given to each
> factor that it considers and how each factor affects its award.  Fender, 12 F.3d at 487;
> Evangeline Refining Co., 890 F.2d at 1327–28 ("If a court awards fees but fails to explain
> why compensation was awarded at the level it was given, it is difficult, if not impossible,
> for an appellate court to engage in meaningful review of a fee award.").

In re Cahill, 428 F.3d 536, 539–40 (5th Cir. 2005).  See also, In the Matter of Bacock & Wilcox

Company, 526 F.3d 824 (5th Cir. 2008); In re Fender, 12 F.3d 480 (5th Cir. 1994).

While these cases obviously predate Perdue, they set out a general procedure that district and

bankruptcy courts in this Circuit have followed for decades.  District courts are bound by the law of

their circuit.  Campbell v. Sonat Offshore Drilling Inc., 979 F.2d 1115, 1121 n.8 (5th Cir. 1992);

Sturgeon v. Struchan Shipping Co., 698 F.2d 798, 800 (5th Cir. 1983).  That being the case, the

Court will not apply Perdue outside the fee-shifting factual scenario for which it was written unless

so directed by the Circuit.

Therefore, the Court finds as a matter of law that Perdue does not apply to this case.

Nevertheless, if it had to apply Perdue to this case, this Court would find as a matter of law that the

evidence is insufficient to support the award of the enhancement for the SCC litigation.  If Perdue

controls, the Bankruptcy Court abused its discretion in awarding the fee enhancement and made a

mistake of law in not actually applying Perdue, as opposed to merely referencing the principles

11

espoused therein.

## III.   The Fee Enhancement Award

The fee opinion authored by the Bankruptcy Court sets out in exacting detail the overall history of the bankruptcy, the ultimate success, and the role played by the lawyers at Baker Botts. This Court sees no need to duplicate that Court's factual recitation. That Court's conclusion that the results in this case "are nothing short of extraordinary" has already been echoed by this Court in several prior orders. For example, in its confirmation order, this Court described this bankruptcy proceeding as "one of the most successful bankruptcy proceeds in recent history" [Doc. No. 79–9 CV 00177 at p. 4]. Not only are the results in this case phenomenal, but the results actually are benefitting Reorganized ASARCO, the appellant, on a daily basis. It went from a near Chapter 7 state to a thriving company freed not only from the overwhelming burdens placed upon it by environmental, asbestos, and toxic tort litigation, but also freed from the labor strife which had plagued it for years.

Counsel for Reorganized ASARCO are willing to concede, while perhaps in less superlative terms, the overall success of the process. They are also willing to concede, and have on other occasions conceded, the role played by the SCC judgment. Their argument against the fee enhancement focuses on two main points. The first point is quite legalistic. Each time Baker Botts received an interim payment, they represented to the Bankruptcy Court, prior to its approval, that the fees were fair compensation for the work performed. That being the case, Reorganized ASARCO argues that Baker Botts cannot now, after the completion of the case, complain that it was underpaid.

A separate, but perhaps overlapping point put forth by Reorganized ASARCO is less steeped in legalistic terms and more based in common everyday parlance. It argues that Baker Botts agreed

to work for these fees and they have been paid the agreed upon fees.  In fact, they have been paid in

excess of $100 million.  As with any quality law firm, it was expected that they would provide

quality legal services.  The fact that it achieved superlative results should not be grounds for a court

to second guess the fee arrangement.  Put another way, if the results were merely good, mediocre,

or bad, Baker Botts was not going to pay Reorganized ASARCO back the agreed-upon fees—so why

should Reorganized ASARCO pay more merely because the results were better than expected?  (A

subtext of this argument would also be to question the reasons for the good results: was it great legal

work or the rise in the price of copper that ultimately proved to be the critical factor?  If the latter,

then why should Baker Botts collect a premium?)  Underlying both points is also the basic tenant of

bankruptcy law that while a professional performing in a bankruptcy context should be paid

comparable to when that professional performs in a non-bankruptcy context, a professional should

not be overpaid merely because a judge has the ability to readjust income levels at the end of the

case.

### A.        The Law Concerning Fee Enhancements

The Bankruptcy Court awarded a 20% enhancement for the extraordinary success Baker

Botts achieved in the SCC case.  The law concerning attorneys' fees in bankruptcy is quite

established.  The Fifth Circuit has summarized it as follows:

> Calculation of Attorneys' Fees
> Section 330 of the Bankruptcy Code gives bankruptcy courts discretion to award reasonable
> compensation to debtors' attorneys in bankruptcy cases.  11 U.S.C. § 330(a)(1)(A).  This
> authority includes the discretion, upon motion or sua sponte, to "award compensation that
> is less than the amount requested."  Id. § 330(a)(2).  Section 330(a)(3) further directs courts
> to "consider the nature, the extent, and the value of" the legal services provided when
> determining the amount of reasonable compensation to award, taking into account "all
> relevant factors," including, but not limited to:
> > (A)     the time spent on such services;
> > (B)     the rates charged for such services;
> > (C)     whether the services were necessary to the administration of, or beneficial

at the time at which the service was rendered toward the completion of, a case under this title;

(D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

Id. § 330(a)(3).

The Fifth Circuit has traditionally used the lodestar method to calculate "reasonable" attorneys' fees under § 330.[8]  In re Fender, 12 F.3d 480, 487 (5th Cir. 1994). A court computes the lodestar by multiplying the number of hours an attorney would reasonably spend for the same type of work by the prevailing hourly rate in the community. Shipes v. Trinity Indus., 987 F.2d 311, 319 (5th Cir. 1993). A court then may adjust the lodestar up or down based on the factors contained in § 330 and its consideration of the twelve factors listed in Johnson, 488 F.2d at 717–19.[9]  See Fender, 12 F.3d at 487. While the bankruptcy court has considerable discretion in applying these factors, In re First Colonial Corp. of America, 544 F.2d 1291, 1298 (5th Cir. 1977), it must explain the weight given to each factor that it considers and how each factor affects its award.  Fender, 12 F.3d at 487; Evangeline Refining Co., 890 F.2d at 1327–28 ("If a court awards fees but fails to explain why compensation was awarded at the level it was given, it is difficult, if not impossible, for an appellate court to engage in meaningful review of a fee award.").

---

[8]The lodestar method is traditionally attributed to the Third Circuit in *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973).

[9]The Johnson factors are as follows:

(1)    the time and labor required;
(2)    the novelty and difficulty of the questions;
(3)    the skill requisite to perform the legal service properly;
(4)    the preclusion of other employment by the attorney due to acceptance of the case;
(5)    the customary fee;
(6)    whether the fee is fixed or contingent;
(7)    time limitations imposed by the client or circumstances;
(8)    the amount involved and the results obtained;
(9)    the experience, reputation, and ability of the attorneys;
(10)    the "undesirability" of the case;
(11)    the nature and length of the professional relationship with the client; and
(12)    awards in similar cases.

Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–719 (5th Cir. 1974).

In re Cahill, 428 F.3d at 539–40.

The burden of proving reasonableness of compensation and reimbursement is on the applicant. In re Babcock & Wilcox Co., 526 F.3d 824, 827 (5th Cir. 2008). There is a strong presumption that the lodestar amount is reasonable. Saizan v. Delta Concrete Products Company, Inc., 448 F.3d 795, 800 (5th Cir. 2006). The lodestar may be adjusted according to a Johnson factor only if that factor is not already taken into consideration by the lodestar calculation. In re Fender, 12 F.3d 480, 487 (5th Cir. 1994). At least four (4) of the Johnson factors—the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, and the results obtained are presumably included in the lodestar calculation. Shipes v. Trinity Industries, 987 F.2d 311, 320 (5th Cir. 1993). Upwards adjustments in bankruptcy cases are permissible provided the application shows rare and exceptional circumstances. In re El Paso Refinery, L.P., 257 B.R. 809, 835 (Bankr. W.D. Tex. 2000).

Thus, an upward adjustment from the lodestar amount may be made if the applicant proves the existence of "rare and extraordinary" circumstances and that these circumstances have not already been included in the lodestar calculation. Various courts have analyzed this in a multitude of ways. Some have suggested that rare and exceptional circumstances exist if there is a full payment of creditors. In re DWGK Restaurants, 106 B.R. 194, 197 (Bankr. S.D. Cal. 1989). Other courts look for some special facts that set the case apart from others and whether non-bankruptcy professionals given those same special facts would be able to recover a higher fee for those results. In re El Paso Refinery, L.P., 257 B.R. at 837. That Court emphasized:

> The precise wording is important. The issue is not whether a comparable firm would reward its partners and employees for bringing in a good "result" (defined usually in terms of enhanced revenues for the firm) but whether the client would feel obliged to pay the firm

a higher rate in return for a "rare and exceptional" result. In the usual case, it is this court's understanding that such "kickers" are negotiated in advance of the engagement. To the extent that a similar "advance agreement" might be seen as a prerequisite, in order to bring our analysis into line with what happens in the marketplace outside of bankruptcy, the facts show that VL "negotiated" for just such a "kicker" in its original retention papers.

Id. at 837–38 n.55. The El Paso Court concluded:

> The thrust of the inquiry, then, is whether the surrounding factors of the case are such that, even after having arrived at an appropriate lodestar, a court would still be constrained by the facts to conclude that the resulting hourly rate is <u>still</u> too low to fairly compensate the professional, as that professional would be compensated in the non-bankruptcy context for delivering a similar outcome.

Id. at 837.

It suggested a three (3) factor test: (1) whether the professionals encountered unique and unforseen obstacles; (2) whether the results far exceeded expectations at the onset; and (3) whether the party paying for the fee agreed to it.[10] In re El Paso Refinery L.P., 257 B.R. at 839. There seems to be no fixed standard by which a court measures a request for an enhancement. The two rules that seems to appear consistently in all enhancement cases is that the circumstances must be rare and extraordinary and that the court should not double count any factor in the enhancement that was used in the lodestar calculation.

## B.   The Appropriateness of the Fee Enhancement

In this case, the Bankruptcy Court found that Baker Botts was "underpaid" according to the prevailing rates for national firms handling large, complex Chapter 11 cases. The evidence suggested that it was underpaid approximately 20% compared to other national firms in similar cases. This underpayment effectively matched the 20% enhancement Baker Botts requested on its

---

[10]The last factor may be in dispute in this case. At one point, the ASARCO board, by a split vote, voted to support the law firms' enhanced fee requests. Reorganized ASARCO obviously opposes it.

entire fee application. Despite the fact that the end results were superior, the Bankruptcy Court

denied this 20% enhancement to Baker Botts. It denied the enhancement due to the fact that Baker

Botts's legal work, although outstanding, was the type of legal work expected of a national law firm

of its caliber. An enhancement should reward rare and exceptional work and should be tied to both

"the effort and the outcome." (Bankr. Opinion ¶ 216).

Nevertheless, the Bankruptcy Court did find that the SCC result was rare and extraordinary

and awarded an enhancement solely for Baker Botts's representation in that case. The details of that

case are briefly recounted in the opinion of the Bankruptcy Court. Additionally, the issues, results,

and complexities of the SCC litigation can be gleaned from the various opinions of this Court. These

can be found at ASARCO LLC v. Americas Mining Corp., 382 B.R. 49 (S.D.Tex. 2007); ASARCO

LLC v. Americas Mining Corp., 396 B.R. 278 (S.D.Tex. 2008); ASARCO LLC v. Americas Mining

Corp., 404 B.R. 150 (S.D.Tex. 2009); ASARCO LLC v. Americas Mining Corp., 419 B.R. 737

(S.D.Tex. 2009); In re ASARCO LLC, 420 B.R. 314 (S.D.Tex. 2009). Consequently, there is no

need for this Court to rehash that case more than it already has.

The Bankruptcy Court found the extraordinary results were due to the performance of Baker

Botts, and not due to any factors that might otherwise make a substantial victory easier (such as those

delineated in the Perdue opinion). It also noted that the task was made even more complicated

because Baker Botts had to decipher millions of documents in order to prove its case, and that it had

to prosecute the case almost solely without the aid of any friendly company witnesses. The witnesses

at the fee hearing uniformly praised the verdict and conceded its role in resolving the bankruptcy.

Even Reorganized ASARCO's expert, when testifying against Baker Botts's fee request, agreed the

SCC result was "rare" and "extraordinary." Whether it is the largest or second largest unreversed

actual damage finding in United States history is debatable.[11]  Whether it is actually the largest

fraudulent transfer judgment ever, as was suggested by the witnesses, may also be debatable.  What

is not debatable is that it was, as some testified, the "game-changer."  This judgment created the

situation where ASARCO went from no plan to two plans that returned the debtor to solvency and

paid all creditors 100% of their debt, plus interest and attorneys' fees.  It allowed ASARCO to not

merely survive, but also to prosper.  Its ultimate effect is contained throughout the record and is

detailed throughout the opinion of the Bankruptcy Court below.

 This Court finds that the recovery of stock and cash worth at least seven billion dollars is

both rare and extraordinary.  It finds that the Bankruptcy Court did not abuse its discretion in its

findings of fact, and that there is an abundance of evidence which supports that court's enhancement

award.  The trickier question is really one that pertains primarily to a question of law.  If a significant

result and outstanding attorney performance are always included in the lodestar calculation, then the

Bankruptcy Court's conclusion that an enhancement is warranted may be incorrect.  Nevertheless,

if there is ever a circumstance where attorney performance and significant results can justify an

enhancement, this case is it.  No lodestar, especially with rates established before the result, contains

a built-in factor for a seven billion dollar judgment.  A seven billion dollar judgment, which is

recoverable, which saves a company, and funds a 100% recovery for all concerned is a once in a

---

[11]Depending on what valuation was placed on the value of the stock of Southern Peru
Cooper Company (SPCC) in 2009, the judgment entered by this Court was worth between $7 and
$10 billion dollars.  At the higher end of this range, this judgment would exceed the prior actual
damage figure in the Texas-Pennzoil litigation in which the jury found actual damages of $7.53
billion.  At the time that verdict was the largest in United States' history.  Counsel has also
pointed out that, unlike the judgment in <u>Pennzoil v. Texaco</u>, this judgment had a bond protecting
it on appeal.

lifetime result.[12]  This Court hereby affirms the Bankruptcy Court's enhancement of the fees

expended in the trial of the SCC case.  It realizes that many courts have postulated that good results

and legal skills are part and parcel of a lodestar calculation, but these courts also (whether they grant

or refuse a fee enhancement) without fail repeat the proposition that an enhancement is still available

in rare and extraordinary circumstances.  This general proposition is also supported by the law in this

Circuit.  This Court finds the SCC judgment to be just the rare and extraordinary circumstance that

these courts refer to, but rarely find.  No one anticipated a judgment as large as this one.

Consequently, if, as a general proposition, a lodestar calculation in fact includes anticipated results,

this lodestar could not have anticipated the SCC result.[13]

## IV.   <u>Fees of the Preparation and Defense of the Fee Application</u>

Baker Botts sought $8,004,920.50 in fees and $457,443.84 in expenses it incurred in

defending its final application for fees.  Included in this amount are $2,684,243.50 in fees and

$252,883.23 in expenses for Baker Botts's pursuit of the enhancement.  The Bankruptcy Court found

---

[12]The Court notes that given the testimony it is arguable that the Bankruptcy Court could
have merely adjusted the lodestar amount 20% and reached the same result.  Had that scenario
occurred, the overall result might have been the same, but the factual attack and legal issues here
might have been different.  The Court will not directly address this proposition as the Bankruptcy
Court made no specific ruling that it adjusted the lodestar.

[13]This Court's holding that at some level the results obtained here have to be so
extraordinary that there is no way they are subsumed in the lodestar rate is limited to the facts of
this case.  No court has been able to delineate an exacting standard as to where to draw the "rare
and extraordinary" line.  This Court cannot draw that line so as to make it generally applicable
either, but regardless of where any court draws that line, this verdict has to be considered rare.
This Court suggests that it is not all that farfetched to make the analogy to Justice Stewart's
concurrence in <u>Jacobellis v. Ohio</u>, 378 U.S. 184, 197 (1964) (concurring).  In that concurrence,
he wrote the often repeated phrase about his inability to define pornography:  "I know it when I
see it."  This Court cannot devise a one-size-fits-all definition of "rare and extraordinary," but it
does recognize it when it sees it.  This is it.

that the fees requested, while reflecting the actual time billed as per their records, exceeded an amount that would reflect reasonable compensation. It approved $5,000,000.00 in fees and $457,443.83 in fees. The Bankruptcy Court, however, did not delineate what fees of those it awarded were attributable to the preparation and defense of its fee application from those expended on the pursuit of a fee enhancement.

This Court notes that there is not unanimity among courts as to whether debtors' counsel can recover fees for the preparation and defense of a fee application. It also notes, as did the Bankruptcy Court, that there is no definitive opinion from our Circuit on this point. The vast majority of courts find that compensating bankruptcy lawyers for the preparation of and the successful defense of their fee applications is necessary to avoid unfair dilution of their fees. The Bankruptcy Court, below, and the many courts referenced in that well-reasoned opinion, accurately set forth the reasons for this policy and this Court will not repeat them here. Suffice it to say that most courts implement this rule as a necessary adjunct to the unambiguous policy underlying Section 330(a) that the pay of bankruptcy professionals should equate to comparable non-bankruptcy pay.

Of importance herein, however, is that both the courts that favor the award of preparation and defense fees and those that do not cite Section 330 as authority. A few courts have declined to award such fees finding that the pursuit of these fees does not benefit the estate. Some hold that the pursuit of fees benefits only the attorneys and is therefore not compensable. Others seem to rely solely on the historic "American" rule that each party bears their own attorneys' fees as a reason for the denial of such an award. Despite those well-intentioned opinions, this Court agrees with the majority view. The time spent defending a fee application "is necessary and beneficial to the bankruptcy system as a whole, and indirectly, to each estate participating in the system." In re Engman II, 404 B.R. 467,

483 (W.D. Mich. 2009). To the extent that sums awarded to Baker Botts represent sums expended

on the preparation and defense of its fee application, the Bankruptcy Court is hereby **AFFIRMED**.

Baker Botts's actions in resolving outstanding fee issues clearly benefits the estate. The fact

that it also benefits Baker Botts does not change the character of its actions. The fees were incurred

as part of the bankruptcy, and the bankruptcy case cannot be put to bed until these matters are

resolved.

> By definition, every fee petition is for the benefit of the petitioning professional. It is not that the professional benefits that is of consequence; what matters is whether the professional's obtaining of reasonable compensation is also a benefit to the estate. As several citations already provided demonstrate, it has been emphatically determined by the numerous courts that have addressed the issue that reasonable compensation for professionals is a benefit to the estate. . . .
>
> If, however, the "no benefit to the estate" argument by the Trustee is based on the premise that there is no longer an estate to benefit—a contention pressed by counsel during oral argument but nowhere evident in the Bankruptcy Court's reasoning—then the answer is that this dispute, like other post-confirmation disputes, must be dealt with as part of the administration of the case. Section 330(a)(4)(ii)(II) expressly allows compensation for services "necessary to the administration of the case." This is such a dispute. Indeed, section 330 anticipates post-confirmation fee applications when it speaks of "compensation awarded for the preparation of a fee application," 11 U.S.C. § 330(a)(6), a process regularly undertaken after confirmation.

In re Worldwide Direct, 334 B.R. 108, 111–12 (D.Del. 2005).

The same, however, cannot be said of the pursuit of a fee enhancement. Regardless of what

standard a court adopts in judging fee requests (Perdue, a lodestar formula, a Johnson 12-step factor

test or some combination of all three), seeking more than the agreed upon fee, however well-

deserved, cannot be said to benefit the estate.

This Court finds that fees expended on the pursuit of an enhanced fee are not recoverable

from the estate pursuant to Section 330. The entire rationale against diluting counsel's fees is

inapplicable in a fee enhancement situation. This Court realizes that there might be an overlap

between the expenses expended in the preparation and defense of the main fee application and those pertaining to an enhancement request. To the extent there is proof that there exists an indivisible overlap, the fees may be recoverable. Nevertheless, where the line between the fees expended for a fee defense and those expended for the pursuit of an enhancement is clearly distinct, services rendered in the pursuit of a bonus are not likely to benefit the estate and are not recoverable under Section 330.

There is a further reason for denying fees expended for an enhancement request. Section 330 authorizes compensation for services that were "necessary" to the administration of the estate. § 330(3)(A)(C). Stated another way, section 330(4)(A) instructs that the Court shall not award compensation for services that were not necessary to the administration of the estate. § 330(4)(A)(ii)(II). A law firm asking for an enhancement to its fees over and above what it is due under its agreement or pursuant to a lodestar analysis is not performing necessary services for the estate. None of the arguments that pertain to the inclusion of the final fee applications apply to a request for a bonus. Therefore, this Court holds that any such request for fees and expenses expended in the pursuit of a bonus are not compensable.

There is one additional category of expenses that should not be charged to the estate. In this matter, there was allegedly some $400,000.00 spent by Baker Botts to correct time entries that were either insufficiently described or clumped or otherwise deficient.[14] Keeping accurate and sufficient time records is an inherent part of any professional's overall professional responsibilities. Any

---

[14]The Court notes that there is arguably evidence that some of these funds might have been expended solely to refute meritless objections. Sums spent to refute an objection to the primary fee request are a necessary adjunct to a fee request and are recoverable. The Court also notes that various individuals mentioned various sums attributable to this category of expenses.

hourly billing rate used in a lodestar calculation necessarily and implicitly contains within that rate the time it takes the professional to accurately record her or his time and services. Even the Southern District of Texas Guidelines for Compensation and Expense Reimbursement of Professionals in Complex Chapter 11 Cases has specific requirements for time records. These guidelines forbid "grouping" or "clumping" in billing records, and instruct that all professionals must keep "accurate contemporaneous time records." While one could argue whether a lawyer can bill separately and additionally for writing down his or her time initially, no one can suggest with any credibility that it is reasonable for the estate to pay a professional to reconstruct time records that were initially done incorrectly.

Baker Botts in this appeal represented to this Court that it sought $8 million in fees, plus hundreds of thousands of dollars in expenses for the preparation and defense of its application for fees and for the work done in seeking the enhancement. Further, in the court below, certain testimony indicated that approximately $400,000.00 was spent in correcting time entries. The Bankruptcy Court gave only one award in this regard. It awarded $5 million in fees and $457,443.83 in expenses (See ¶ 232). It arguably included in this award fees for the pursuit of the enhancement (See ¶ 231). It also awarded fees or expenses which may or may not have included the costs to correct faulty time records. This Court cannot tell how much, if any, fees or expenses incurred to correct inaccurate time entries were included in this final award. Nor can it tell the amount, if any, of fees and expenses that were awarded for the pursuit of the enhancement.

Baker Botts suggested in oral argument that since the Bankruptcy Court ordered less fees and expenses than those sought for the preparation and defense of the fee application that this Court should just presume that no recovery was given for any categories it finds unrecoverable and that it

23

should just affirm the award. While this is mathematically possible and theoretically may be true, this Court cannot engage in such monetary guess work. Therefore, it remands this case back to the Bankruptcy Court for it to elaborate and/or reconsider its award in this regard. It should delete or reform its judgment so as to remove any award of fees and expenses for the pursuit of a fee enhancement. It should also delete all sums awarded, if any, for the recreation of initially inaccurate or insufficient time records.

## V.    **Post-Judgment Interest**

Both Reorganized ASARCO and the Plan Administrator object to the award of post-judgment interest. Given that the Court is remanding this case to the Bankruptcy Court for further elucidation and/or a recalculation and/or further hearings on the issue of fees and expenses, the issue of post-judgment interest is technically moot. Title 28 U.S.C. § 1961 allows for an award of post-judgment interest, but it is virtually a tautology that post-judgment interest by necessity requires a judgment. Given this order, there is no final judgment.

Mindful, however, that the Bankruptcy Court will, with all deliberate speed, resolve the issues necessitated by the remand, this Court feels compelled to address this issue so that it will not necessitate further briefings and so as to maximize judicial efficiency. Appellants argue that an award of post-judgment interest is inappropriate for two reasons: (1) an award of administrative fees authorized by § 330(a) is not a judgment and consequently § 1961 does not apply; and (2) the Reorganization Plan does not allow or provide for interest on these sums. This Court agrees with both positions.

There is no statutory authority which controls this issue and the case law and Rules of Civil Procedure give little more guidance. Section 1961 provides for the award of interest on all civil

24

money judgments. Its exact wording is "on any money judgment in a civil case recovered in a district court." An award of legal fees pursuant to § 330(a) is a payment by the estate of expenses necessary to enable the system to "operate smoothly, efficiently, and expeditiously." H.R. Rep. No. 595, 95th Cong. 1st Sess. 330 reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6286. That being the case, the award of fees is not a money judgment recovered, but is an order of the Bankruptcy Court to pay certain expenses. It necessarily follows that since the order awarding fees is not a civil judgment, § 1961 does not apply. See St. Paul Fire & Marine Insurance Company v. Vaughn, 779 F.2d 1003 (4th Cir. 1985). Stated more simply, "[s]ection 1961 is inapplicable to the grant of attorneys' fees in a bankruptcy case because attorneys' fees in bankruptcy are an expense of administering the estate and, therefore, do not constitute a money judgment." In re Comandante Management Co., LLC, 395 B.R. 807, 818 (D. Puerto Rico 2008).

The Fifth Circuit, in a case involving a claim for interest on a Chapter 7 bankruptcy trustee's compensation and expenses, was called upon to decide whether the interest should begin on the date the bankruptcy petition was filed (the minority view) or whether it should begin to accumulate upon the actual award of the bankruptcy court (the majority view). After reviewing the availing case law in all deciding circuits, the Fifth Circuit rejected both views and held that no interest was due. It reasoned that unlike a payment of interest to a creditor, which is authorized by 11 U.S.C. § 726(a)(5), an administrative expense did not fall into the same category as a pre-petition debt. In re Reed, 405 F.3d 338 (5th Cir. 2005). It relied on both a Second Circuit case, In re Klein Sleep Products Inc., 78 F.3d 18 (2d Cir. 1996), and a case of its own, In re Van Gerpen, 267 F.3d 453 (5th Cir. 2001), for authority that administrative claims and those made against the estate by creditors are not treated the

same. The Reed court ultimately held that the trustee and similarly situated professionals are not entitled to interest on claims for fees and expenses. The court concluded:

> To preclude recovery of all interest on a trustee's compensation and administrative expenses is no more untenable a result than that reached by the minority view, which reading "allows for interest to accrue on services before they are rendered or expenses before they are incurred." Reed II, 312 B.R. at 839.

Id. at 344.

While not entirely on point, the eventual conclusion is the same—administrative expenses, including fees, are not treated like a judgment mandating interest. This Court agrees with this theory and finds it applicable here. Absent some other compelling authority, interest is not statutorily available on administrative expenses.

Reorganized ASARCO and the Plan Administrator also argue that such interest is not available because the Reorganization Plan adopted by this Court does not provide for it—when it specifically provides for and orders interest in other situations to various classes of creditors. Compare Art. II, 2.1 with Art. IV. This is true and the Court also sustains the objection based upon this argument as well.

The Court notes that this does not relieve Reorganized ASARCO or the Plan Administrator from the duty of paying any claims allowed in a prompt manner. Article XIII, 13.8(e) of the plan, provides that a claim that has become allowed (such as those involving administrative expenses) shall be paid "no later than the 10th Business Day after the end of the calendar month in which such Disputed Claim becomes an Allowed Claim." The failure to make such a payment will cause the Plan Administrator to face the consequences that any party would face for failure to comply with a court order.

For these reasons the Court sustains the objections of Reorganized ASARCO and the Plan

Administrator to the award of post-judgment interest on the legal fees and expenses, and instructs the Bankruptcy Court that it should not include such an award in its revised judgment.

## VI.    <u>Conclusion</u>

This Court affirms the award of the fee enhancement for the services rendered by Baker Botts in the SCC litigation.  It reverses and remands the award of the Bankruptcy Court for the fees and expenses awarded for the preparation and defense of the fee application to the extent that it has included in that award fees and expenses to Baker Botts for its pursuit of the enhancement or for any amounts it had to expend to correct its own inaccurate, vague or non-compliant time records.  Since the award by the Bankruptcy Court was made in one single amount for fees and one single amount for expenses, this Court cannot determine what sums are recoverable and what sums, if any, are not. Nor can it determine if any of the award has been given for fees or expenses which are not reimbursable.  Therefore, this Court remands this case to the Bankruptcy Court so that it can make further findings in this regard.  Finally, for the reasons stated above, the award of post-judgment interest cannot stand, and any ultimate award shall be paid pursuant to the Plan of Reorganization. The Order Granting Final Fee Application (Case No. 05-21207, Doc. No. 16334) is reversed and remanded to the Bankruptcy Court for further elucidation consistent with this opinion.

Signed this  8th  day of August, 2012.

Andrew S. Hanen
United States District Judge

27